Good morning, everyone. Welcome. We continue our sitting of the Third Circuit in Pittsburgh, something that is not a long, longstanding tradition of the Third Circuit, but has become a tradition in the last decade and a half, I suppose, almost two decades. And with that in mind, too, Judge Hardiman and I, as products of the Western District, are delighted to welcome our colleague, Judge Schwartz, from the sovereign nation of New Jersey. Thank you. We've invited her here to enjoy the sights and the safety of Pittsburgh compared to Newark. Thank you. Delighted to have our beloved colleague, Judge Schwartz, with us. Thank you. So we'll call the first case for oral argument listed for this morning, which is Castro v. Department of Homeland Security. And Mr. Gallant? Yes. Gallant. Good morning, Your Honors. Good morning. May it please the Court, Lee Gallant from the ACLU on behalf of the Central American Women and Children. With the Court's permission, I'd like to reserve four minutes for rebuttal time. Granted. Thank you, Your Honors. The issue in this case is whether Congress has and constitutionally could preclude review over the legal validity of a removal order. Well, that, indeed, would seem to be the overriding of the primary issue. But could I, at the outset, ask you about the statutory construction issue that is set out here and begin by asking if any other court of appeals in the country has embraced the position that you have in your brief relative to 1252? Yes, Your Honor. We believe the Ninth Circuit in the Smith case. How does Smith answer the question? Smith really just smotted you the issue of jurisdiction in order to reach the merits, didn't it? Well, Your Honor. Did it really come to grips with the statutory construction? Well, Your Honor, it's a fair point that it's not a lengthy discussion, but we made the argument very specifically in Smith that there were two issues. And the first issue is the type of issue we're raising here, which is the boundaries of the ER system. Who gets to decide the ultimate question of inadmissibility and entitlement to relief? I mean, so we don't waste your precious time. Okay. Would you agree that the Ninth Circuit panel in Smith assumed really without deciding the jurisdictional issue? Your Honor, the only thing I would say to that is that they did drop a footnote, footnote six in Smith saying we reserve the suspension clause issues because we find jurisdiction to review whether this person was properly put into expedited removal. But I take your point, Your Honor, that it was not a lengthy discussion. And so what I think is that there hasn't been a lot of grappling with the statutory construction issue in the courts of appeals. There's not been discussion of the relationship between the two sentences in 1252E5. A lot of the cases were not briefed. Only four of the cases were habeas cases. And our statutory position is this, that the ultimate question of inadmissibility or entitlement to relief certainly cannot be reviewed. Congress precluded that jurisdiction. But what can be reviewed is whether someone is properly put into ER. And that is who is the ultimate decision-maker over the question of entitlement to relief or inadmissibility. And isn't that a kind of challenge that the statute contemplates would have gone to the District of Columbia? Put aside the 60-day limitation. Right. I mean, the 60-day thing is a big thing. And the government would, of course, invoke that. And the D.C. Circuit has said that's a block. We don't believe that the issues we are raising, there are issues, you're absolutely right, Judge Schwartz, that there are issues that would go to D.C. If we were bringing across the board facial challenge, what we are seeking to do is simply enforce the current regulations and statute in our individual cases. We don't believe that the government has a written policy saying people are supposed to be adversarially questioned or that AO is supposed to apply the wrong standard. But your opening remarks to us is who ultimately decides whether the expedited removal decision or the credible fear determination was made, appropriately made. That was the way you framed your opening remarks. And that's the who decides question strikes me as a contention that the way the statute is currently written without Article III court review is a systemic problem. Well, so let me, that's an important point you're raising. And let me sort of break it apart if I could. That to the extent we are saying there has to be federal court review in habeas, that is a systemic challenge. You're absolutely right. But that is not a systemic challenge that would go to D.C., and I think the government would agree with that. And that's because in 1252E3, that's the provision that deals with systemic challenges, it says systemic challenges to 1250, 1250, 12, sorry, 1225, the substantive provisions. There is no question that this court and any court where there is habeas review would be able to review the jurisdictional question, whether systemic or in particular. We don't think actually it's a systemic question. On the merits, we believe all our claims are individual. And on remand, there are 14 judges in the Eastern District that have received these cases. They will look at our particular claims. The only thing I would say, because the merits are not before you, is that there is one common theme among all the 28 petitioners that still remain, and that is they were all found factually credible. What the AO said was you did not connect the legal dots, you did not show a nexus. That's not what the expedited removal process is supposed to do, is require these young women after a long journey traumatized to be able to explain the legal requirements. It was clear that they all should have passed for a variety of reasons. But, again, that's the merits question. And so on the statutory construction, you know, Judge Smith, it's a fair point that Smith did not grapple with the issue, but I don't think any of the cases the government has cited grapple with the issue. And I think the implications of the government's position of saying the agency has complete control over the boundaries of the expedited removal system are fairly staggering. The statute is very clear that someone from Cuba, that's the subsection F, which talks about we don't have diplomatic relations with a country in the western hemisphere, that's a reference to Cuba, they could put a Cuban person in E.R. The government is saying, well, it's not a mistake. An identity claim, that person would have no recourse. They could take someone who's been in the country five years and put them in expedited removal. That person would have no recourse. So we do not believe that Congress intended the agency to have control over the boundaries of the expedited removal system. Under St. Cyr, that person would seem to have recourse, wouldn't they? That person you just described would seem to be similarly situated to the legal permanent resident in St. Cyr. Well, I think that what St. Cyr, we believe as a suspension clause matter, absolutely, that they need to be able to go to court. I think the same statutory construction argument involved in St. Cyr is not here because we're dealing with a different provision. But if I could, Judge Hardiman, turn to the suspension clause. As we've explained in our brief, as the habeas scholars brief explains, as this court in Sandoval explained, as the Supreme Court in St. Cyr explained, as the Supreme Court in Boumediene explained, as Guzam makes clear, there has never been a time in the history of this country in which someone did not have access to the federal courts to challenge the legal validity of the removal order if they were on U.S. soil. That is absolutely clear from the cases. And we believe the government is simply relitigating these cases. I mean, the briefs are virtually identical to the briefs they submitted in Guzam, which Judge Smith sat on, to Sandoval, the briefs in St. Cyr, Boumediene. And the government essentially makes three points. The first is these people don't have due process rights, therefore they don't have suspension. Let's start with that. Yeah. Because that would seem to be a starting point in the analysis for purposes of your suspension clause argument in any event. And I must concede that I have been grappling with just that. I mean, what are petitioner's rights here, constitutional or otherwise, that would be vindicated by habeas corpus? Identify those rights. Yes. Your Honor, that's an important point. If I could just step back one second, because I think you're asking a question about the merits in some respects. No, I'm not. So let me just see if I can then be responsive. The first point is the suspension clause does not hinge on whether one has due process rights. The government has no answer to that. That is 100% clear for many reasons. The first is the suspension clause was one of only two individual rights in the original Constitution, the other being the ex post facto clause. The due process clause didn't come along until four years later in the Bill of Rights. What the framers understood the suspension clause to be about is enforcing your statutory and regulatory rights. The due process clause later came about, and therefore someone could also enforce the due process rights. If there was any doubt about that beyond that there was a four-year gap, Boumediene resolves the question. Boumediene said the detainees at Guantanamo have suspension clause rights. We reserve whether they have due process rights because that was a very contentious issue about whether they have due process rights. Now, as to our people, our people clearly have due process rights because they entered the country. Moreover, as Kuzang stated, even if they were arriving aliens who had not entered the country, they have the right to statutory fair procedures related to their asylum. But even if this court were to say we're not going to resolve whether they have due process claims on the merits, they clearly are raising, and our primary arguments are statutory and regulatory, and there is no question that they have statutory and regulatory rights. That would be true even if they were arriving aliens. It's certainly true because they entered the country. So your whole thesis begins with the point that they, quote, entered the country. That is, they crossed the border and landed on U.S. soil. So the assimilation issue, which is a mazai, and the government talks about that, from your point of view, you think that we would be mistaken to rely on the fact that these folks would be in the United States for 15 minutes. That's absolutely right, Judge. There is no law ever, and that's pointed out by the amicus brief by the immigration scholars, that says it turns on the amount of time or how you entered. That has been the law for more than 100 years, and the government has conceded that point over and over for 100 years. Congress can do what it wants. Let me, for clarification, try to understand this a little better. Is it the fact that they entered? Is it the fact that they are physically present? Or is it both? Does this matter? I think it's both. I think it's more that they physically entered. But I do want to return to one point that I think is critical, is on the merits, even if this court does not think they have due process rights, they clearly have statutory and regulatory rights to enforce in habeas. And the government simply ignores that point. But the critical point about habeas is, even if they were arriving aliens, even if you want to accept the government's assimilation point, arriving aliens at the border have always had habeas rights, forever. Khuzam said that. St. Cyr interchangeably cited. So if somebody flies from the United Kingdom and lands at O'Hare with papers that they think are valid, and they can't even clear customs and they get put in a holding room, you're saying the executive has no right to put them back on the plane, the next plane back to the U.K.? That person has a habeas right? Yes, Your Honor. The government can't put them on the next plane? Yes, Your Honor. And I would say two things. As a practical matter, very few people challenge it. That's irrelevant. As a legal matter, yes. And if you look at the Gigio case that we've cited, Justice Holmes, or the dozens of other cases like that, that the amicus habeas scholars cite, or that were cited in St. Cyr that we cite in our brief, that has always been the law. Habeas corpus has always ensured the right to go to federal court to test the legal validity of the removal order. So the executive has virtually no power, no Article 2 power, to police the borders independent of judicial review. That's your argument. Your Honor, that's absolutely right. That is our argument based on 100 years of precedent. The one thing the Supreme Court has been steadfast about over the past, since they've been regulating immigration since 1875, is you have the right to go to court. It may be very short, and the government has suggested these are going to take a long time. That's not true. This case is taking a long time because they're fighting jurisdiction. As Boumediene said, the district courts can handle these things sensibly, can maybe order expedited briefing. If they think there's nothing there, maybe they'll turn it around. But the one thing the Supreme Court has never wavered from is that you have a right to go to court, even if you're an arriving alien. But I do want to stress, Your Honor. Let me follow up on Judge Hardiman's question then, because the reach of what you have suggested seems vast. And it also suggests, and I think the government has made this point, that your position really would vest in the person who crossed the border clandestinely more rights than the person who approached the border and was stopped there just inches away from physical intrusion. Isn't that correct as a practical matter and as a legal matter? Isn't that right? Well, Your Honor, yes and no. And I want to be absolutely clear about this. That covers a vast area, too. The yes and no always leaves it open. Right. Well, I want to be absolutely clear about this, Your Honor. It does not, for habeas purposes, create a differential. The Supreme Court has been 100% clear whether you land at an airport or at the border, you have habeas rights, or if you're in the country. If you look at the Jijo site that we have or any of the other cases, so the habeas rights would be the same. What potentially could be different are your merits claims, someone at the border, someone in the country. But this Court has made clear, at least with respect to asylum, if you look at the Kuzam site, if you look at Ezeguanu, Abdullah Rahman, any of those cases cited in Kuzman, you at least are entitled to fair procedures, even if you don't have a constitutional right to asylum, even if you land at the border. But this Court certainly doesn't need to write a broad-reaching opinion. These are people who entered the country. There is no authority whatsoever for saying these people do not have habeas rights to challenge the legal validity of their order. And you know all these cases very well, I know. But the cases that you just discussed, in those circumstances, at least one or two of them, the petitioner was complaining about the application of this particular type of removal to them. They're not subject to it because I'm a lawful permanent resident. I don't fall into the category. Your clients fall into a different category. There isn't a dispute as far as I know that they would fall within the expedited removal process because of the length of their presence and their distance from the border. Correct? So isn't that a big difference between the cases you just discussed and your clients? Well, I think the cases I just mentioned, Your Honor, are cases cited in Kuzan that were not expedited removal cases. They're just simply saying that when you land at the border, you're entitled to a fair procedure. But our cases in the country, because you're raising an important point, I just want to be as clear as possible, Your Honor, about this. We are not saying that they weren't subject to the expedited removal process initially. What we are saying is if they turn out to be bona fide asylum claims, the statute and reg make it clear that the ultimate decision about asylum must be made in a regular Section 240 immigration proceeding. So what we are simply saying is Congress did not want to. The government agrees with that, presumably. I mean, they get put into the category of the 86%. But that's not the predicament your clients find themselves in. Well, Your Honor, I think the fact that there's a high rate of passage now, I think it is not all that meaningful for a few reasons. One is the passage rate has not been that high. You know, the government is selectively citing those statistics. It's not been that high. Well, either way, that doesn't necessarily expand or circumscribe your clients' habeas rights. No, absolutely, Your Honor. And that's why I just wanted to say habeas is an individual remedy, and it's ultimately about what these women are doing. And the habeas proceeding may be very short. It may be very perfunctory. But it would be a first time in the history of this country in which someone on U.S. soil entered the country, did not have the right to go into federal court to test the legal validity of their proceeding. I see that I am into my rebuttal time. Yes, we'll have you back on rebuttal. And as you know already, we don't always adhere to the clock. Thank you, Your Honor. Thank you. And we'll hear, then, from the government. And pronunciation for me today has been a challenge. Is it Ruvini? Ruvaini? Ruvaini. Ruvaini. Thank you, Your Honor. Mr. Ruvaini, if I may, we do law here, and the government does law, and they do policy. But let me start out with a strictly policy-related question. And I concede that expressly at the outset. And it also is in response to something that you argue in your brief. What are the policy and practical implications to the government and to the expedited removal process? Were we to hold consistent with the position taken by petitioners here, taken by the ACLU? Well, I'm glad you asked. I don't have to speculate as to that. It's right there in the 1996 amendments to the immigration law and the legislative history in ERIRA, where Congress specifically noted that at least 150,000 individuals at the time were arriving every year asserting asylum claims. And given limited enforcement resources, limited beds, limited detention space, because the statute requires those individuals to be detained or released at the time, they would disappear into the interior and we'd never hear from them again. And that was fundamentally the issue Congress was faced with. And then again in 2004, when DHS expanded the application of expedited removal, as the statute permits, to individuals within 14 days of crossing illegally or 100 miles of the interior, noted that at that time a million individuals at that time were potentially crossing the border and being apprehended after having done so illegally. And there's just nowhere to put all these individuals, so they have to be released, and then we don't ever see them again, or a large number of them. And the statistics, while they don't necessarily drive the habeas inquiry, that's a constitutional issue, of course, 50,000 people make these claims as of the most recent data. Last year it was 48,000. Thus far this year, in just the first two quarters, it's over 20,000. And so it looks like it's going to surpass the 50,000 and 48,000. And if plaintiff's position prevails that actually they have a right in habeas proceedings to review the evidentiary sufficiency of the determination the executive has made as to whether these individuals are admissible to the United States, after an initial interview, after a supervisory officer signs off on that, and after an immigration judge conducts a de novo review, we're simply eviscerating the purpose of ERIRA by allowing judicial review in court of these 50,000 cases of individuals asserting credible fear. That's their constitutional argument, though. They say that the whole point of habeas is to get an Article III judge. And however competent the government might believe the asylum officer and the other two levels of review are, you would agree, would you not, that there's no Article III judge provided in that system? Well, there is. And I think here it's helpful to point out that plaintiffs and the government agree on one point. We're not saying they have no habeas rights at all. We're just saying that anything you would vindicate in a habeas proceeding is covered by the statute as it's written. All right. Well, what habeas rights does the government contend these folks have? Well, I would begin at the beginning with a Supreme Court case that answers that question. That's ECU from 1892. And then again, the Supreme Court's applying that to individuals who had clandestinely, to use Judge Smith's language, and that's in that case, clandestinely crossed the border and then were apprehended almost immediately thereafter. That's Yamataya, a 1903 case. They do not have a habeas right to review of the evidentiary determination or the application of facts to the question of admissibility. They do have a right, traditionally, at least in the detention context, to the review of pure legal questions and constitutional questions. And here I think it's helpful to ---- So you agree then with Mr. Galleric that if a fellow comes from the U.K., presents himself at Pittsburgh International Airport, they don't let him into the country, that that person has a habeas right to see an ROTC? No. He has what the government has given him in the 1252E2 proceeding. Which is what? I mean, so your view is the government can just put him on the next plane and send him back to the U.K.? Absolutely, unless he makes a claim of credible fear. All right. Then why didn't the government take these folks and send them right across the border? Because they made a claim of credible fear. And so under the statute and the regulations, we're required to explore whether they have a valid asylum or withholding claim. And that's what's happened here. Each of these individuals went through the process outlined at 8 U.S.C. 1225 and 8 CFR 208.30. So then you're arguing that the government has given them more than they were entitled to when they were captured? Correct. The government didn't have to give them that process. All right. But they're in the country now, so why don't they have due process rights? Isn't the law clear that persons found within the United States have due process rights? I'd say two things to that. First, no, it's not clear. I think it's instructive to look at the Yamatai decision, which specifically states, we are not deciding the question of the due process rights of individuals who, quote, enter the country clandestinely. And then I'm paraphrasing here, in no way have assimilated into the population. So someone who entered the country 10 years ago clandestinely and is now in Phoenix and has a wife and three kids and the government gets around to finding him, he has no due process rights? Well, that's not this case. Individuals here have been here for a matter of hours at best. But in that situation, based on those facts, the government would put those folks in 240 proceedings. And they would have all the rights, that's the normal rule of proceedings that occur, under 8 U.S.C. 1229A, and they would have all the statutory rights attended to those types of proceedings. But how can ñ I mean, this presents challenging separation of powers questions. How can the court police the executive's ability just to say what rights these folks are entitled to? I mean, one year it's 14 days and 100 miles, and the next it might be, you know, six months and 300 miles. I mean, is it your position that the courts have no role in policing those sorts of executive decisions? Not at all, Your Honor. And I think your example really leads into the issue of 1252E3. So were the government to change the rules of the game, as it were, to 300 miles, 500 miles, whatever it may be, anyone subject to that new system can go to the district court for the District of Columbia and say, hey, this is unconstitutional. Maybe for 100 miles that was constitutional. This is not. And I think ñ So what saves your case, then, is that these folks truly were very recent arrivals, and they truly were caught basically right at the border. I don't know that it saves the case. I think the government would take the position that if they were here for a matter of days, it wouldn't matter as well. In that, I would refer the court to the Pena decision out of the Ninth Circuit, where the court there found an individual exactly in plaintive circumstances, who had been there for, in the court's words, several days. Alleged credible fare went through that process, said he didn't get a lawyer during his proceedings. The Ninth Circuit said he has limited review in the 1252E process. He hasn't made those claims. The fact that he can't get further review is not a problem. There's no issue. To what extent should we look to the so-called entry fiction to support your position? Well, I think if the court adopts the position that the government is taking as its primary argument as to the assimilation of these folks for constitutional purposes, and mind you, with respect to admission to the United States, not with respect to substantive due process, not with respect to equal protection, just what rights do they have to challenge the denial of their entry to the United States? I think the entry fiction is directly on point. It says individuals who have been apprehended at the border and are allowed to remain in the border or in the interior while their admissibility is determined are as constitutionally as though they never entered the United States. And I think there it's helpful to look at Zavidas, which there said the individual in Zavidas was found removable after being in the United States for a very long period of time. He was a lawful permanent resident. He had full due process rights to challenge his removal proceeding through the petition for review process. And it reserved the question. It said the issue of an individual denied initial admission would present an entirely different question. I think that's really what distinguishes every single one of the cases that plaintiffs are referring to as to individuals who are physically in the United States have due process rights. And more to the point, even if Neze is not directly on point, if an individual who has crossed the border illegally and is here for a matter of minutes, most of these folks an hour at best, some of them maybe three, I believe, they are at what the Seventh Circuit referred to in an expedited removal case, con at the lowest ebb of whatever due process rights they may have. So they may have some due process rights under that analysis, but what Congress has given them satisfies whatever those due process rights are. They've gotten full review at two administrative levels. They then have the habeas mechanism to say, wait a minute, no, no. I'm not someone who should be in the system. I'm a citizen or I'm a lawful permanent resident or I'm a refugee or an asylee who's been admitted previously and I still have that status. And that's all the safety valve that actually cases like ECU and Yamatai require. That seems to be your best argument against the suspension clause argument made by the other side, that Congress has provided some species of habeas relief. Absolutely. But there's a potential problem there, I think, which is for these folks, they don't qualify for that species of habeas relief. So analytically, are we to start by considering the person and asking whether that person gets a habeas remedy, or are we to look at the statute generically for purposes of the suspension clause and ask whether the statute provides some form of habeas? Well, I think you look at it this way. So this is why we take the position in the brief that you first start with, what, if any, due process rights do these individuals have? And then I think – Well, forget the due process for a minute. Just focus on the suspension clause. I mean, that's what habeas is for. That's what the Supreme Court has told us habeas does. Well, but habeas is a different – it's a different constitutional provision than the due process. I understand. But if I could refer the Court to, say, Heckley, a 1953 case, which plaintiffs rely on as well, it says at bottom courts always have jurisdictions to ensure that the minimum due process requirements are met. And here the minimum due process requirements, as this Court has said in cases like Marincas and Dia, are the statute, what the statute provides. Even if we agree with you that the levels of review provided by statute comport with due process, is there not a separate question as to whether or not the writ of habeas corpus has been suspended as to these petitioners? Well, I'd say two things to that. One, it's not whether the statute satisfies due process. The D.C. Circuit, the only court of competent jurisdiction to decide this issue, has decided as a facial matter it does. But more to the point, the statute is due process for purposes of individuals apprehended at the border, like plaintiffs here. But, two, taking it even to the suspension clause, what does the basic base suspension clause require as opposed to 2241 habeas, which is the statute at issue in all the cases plaintiffs rely on, and the issue there is prolonged detention, if not indefinite detention, as in Boubidin, as opposed to denial of entry to the United States. Even there, questions of law may be reviewed. But here, and I think here it's helpful to look at Botringer, this Court's prior panel decision on which the district court relied in part. The folks, the individuals here are challenging the evidentiary sufficiency of their ultimate determinations. As a plaintiff's counsel said earlier, we think under the standard we should have won. That's a classic disagreement with the way the evidence was weighed and a factual conclusion was reached. And, again, ECU, MATIA, all cases relying on those cases say that cannot be reviewed in habeas. It's never been reviewable in habeas. There's no suspension clause issue if you don't get factual determinations reviewable in habeas. And a third case, I think, is instructive on that point. This is the only real case from the finality era that actually talks about the suspension clause, and it's a Supreme Court decision. I'm going to mispronounce it, Zach and Nate, from 1912, where they rely on ECU, cite the language I've just described to you, rely on MATIA, cite the language I've just described to you, and say the individual in that case said, well, I want review of the determination that I'm not an admissible. The court said the suggestion that this is a suspension clause violation doesn't deserve any discussion at all. At that point, it was settled that these issues are not reviewable, and it's been settled ever since. So I would refer on the legal point. So two things. Plaintiffs primarily say we should have won under the correct legal standard. And in the process of making that argument, they create a legal standard. They say we should have won because we showed a 10% probability that we would have ultimately won under our well-founded fear claims. The question of well-founded fear is a factual question. So whatever significant possibility means under the statute, it's a factual question as well. So that's this case, this court in Abdullah explained that's a factual question. So, again, under ECU and progeny, not reviewable. I'd like to ask you a slightly different question. I'm sorry, but your position is that these individuals get no Article III review because the statute, Congress didn't give it to them other than what the limited habeas provision provides. And they came in and apprehended surreptitiously, came in clandestinely, and then were apprehended very quickly. We compare that to someone who got into the United States clandestinely but didn't get apprehended for four or five years. They get regular removal and Article III review. How do we distinguish those two categories of people? Why does one get Article III review and the other doesn't? When their entry was the same, they didn't present themselves to an officer, but one was not as good at passing through law enforcement's detection than the other. Well, for starters, the statute tells you why. The statute at 1225 says the dividing line for what can and cannot be permissible for expedited removal is two years. And then the regulation tells you it's 14 days. And unless and until that regulation is changed, that's the operative line of demarcation, 14 days. So it's in your position, though, it's because for individuals of this sort, Congress decides the rights they're entitled to. Yes. The executive and the legislature gets to decide issues of entry into the United States, and they get to set the rules, and it's whatever they bestow on these individuals is what they get. That's exactly right. Congress has the authority. What it delegates to the executive, as it's done here, the executive has the authority to implement that delegation. So the five-year individual, again, not this case, vastly different in terms of liberty, interest, and state because they've actually been here and under a Supreme Court precedent have developed ties, presence, community, family, all things that the courts routinely find to suggest it increases one's due process rights, even if they've entered clandestinely, even if they've crossed illegally. And to that effect, I think, Judge Smith, you were discussing with plaintiff's counsel briefly the issue of incentives. I'd like to point the Court to its decision in Martinez, I'm sorry, Verde, V-R-D-E, which I believe, Judge Smith, you were on the panel on, which basically describes the logical conclusion of the argument here as a mockery of those that actually follow the law, and that's a relevant determination in terms of what due process rights an individual has. Have they exposed themselves to the laws of the United States? Have they lawfully presented themselves for admission? Each of these individuals, in theory, could have presented themselves at a point of entry, and we'd be having an entirely different conversation. But they didn't. They crossed the border. But the executive's failure to police the border has caused this problem. I mean, it's not the court's making. I mean, you want the courts, it sounds like, to say that these folks have no rights because the executive has been unable to preclude people who have no legal right to be in the country. Well, no, I wouldn't say that's our argument. I would say that Congress wanted the executive to be able to police the border precisely because it cannot possibly pick up every single individual and enforce immigration law. But since when did the border become 100 miles from the border? I mean, isn't there an Alice in Wonderland quality to that? Well, not really. You can look at the Fourth Amendment context where the border is not just an arbitrary line on a map but is a functional area on a map. And here, Boumediene is particularly instructive. The suspension clause isn't formalistically applied in Justice Kennedy's opinion. It's a functional inquiry. So the border, if we just view the border as a line, and the fact you've got to cross it for two seconds, now you have full due process rights like a citizen, that doesn't sound functional at all. That's very formalistic and not what the suspension clause requires under Boumediene. You've talked to us about the statute and CFR provision, and it sets forth a number of procedures individuals who are in this process are entitled to. What mechanism do they have to enforce that? You have all these various privileges or rights, I guess, statutory or by the CFR, to go to an asylum officer and have a written determination and then go to an immigration judge. What if one of those steps is not followed? Where do they go to seek enforcement of those rights that Congress gave them? Well, it's not a 1252E2 proceeding because E2 pretty clearly says you can't get review of anything other than, did this expedited removal order issue to this individual? Is this person a citizen? Are they a lawful permanent resident? Are they an asylum? They could not come to an Article III court and complain, hey, I never got to an immigration judge. They couldn't come to this court. I think they could go. I think the safety valve is E3, put aside the 60-day time limit for a minute. They could go there and say, hey, the statute allows them to remove these types of people in this situation. They're not doing that here. I did not get IJ review. I did not get individual assessment of my credible fear determination. I think that's an E3 claim, and that's court after court. So Kahn, Rincon, Pena have relied on E3 to avoid addressing any of the due process issues at all. This sounds like a due process challenge to the statute. It's got to go to D.C. So that's another basis, I guess, from your point of view, that there's no suspension here. Precisely. There are two fora in which different types of claims can be raised. Status claims, am I entitled to enter the United States? That's E2. Am I who you say I am? That's E2. And E3, are you actually systemically implementing the authority that Congress has given you, the executive? And just if I may, I see I'm over my time. If I may, one more point on the asylum issue. I just want to emphasize that it's a factual question whether an individual has a well-founded fear of persecution. That's the ultimate question that they wish to have adjudicated by this Article III court. And that's a factual question that's not a question of law. Just calling it a question of law would make everything remotely discretionary, reviewable in federal court. We think they misapplied the law as a talismanic label is not enough to get you around the bar that Supreme Court has affirmed time and again as a reason for why factual review is not available in district court. Counsel, I just have one quick question. Your understanding of the suspension clause, is that something that the executive does if it were to be violated? Congress provides a certain species of habeas rights to some people. Can anybody, any branch of government suspend the clause, or is it something that you understand would typically be done by the executive? I don't know that the executive. Think Civil War. An action they take, would it suspend? There's just not a lot of law out there about defining what is a suspension of the writ. What's the government's understanding? Based on the pure language of the constitutional text, the executive, I believe, would decide there's a rebellion or an invasion warranting suspension of the writ. I don't think that's the only authority. There's further authority that Congress can establish the contours of the habeas remedy, as opposed to habeas jurisdiction. Can Congress also be guilty of suspending the writ in violation of the suspension clause? I must admit, I don't have a good answer for that. I don't know. It's beyond the scope of the briefs here, but I'm happy to follow up with that if you'd like. But I think here the bottom line is no suspension has occurred, because the baseline review, whatever it is that the suspension clause requires in an Article III court, is provided for here through E2 and E3 as to systemic constitutional claims, as systemic claims that you're not applying this as Congress intended, and to individual claims as I should be allowed to enter the United States because I'm a citizen, or you can't apply this to me because I'm a lawful permanent resident or a refugee or asylee. Thank you. Thank you very much, Mr. Blumenthal. Mr. Gallant, we'll have you back unrebuttably. Thank you, Your Honors. There's no question that there has not been a suspension here, whether the executive branch could do it. We don't believe the executive branch could do it, but there's no question there has not been a suspension. That's a formal requirement, a declaration, like in the Civil War. So I just want to put that out to the side. The fundamental disagreement between us and the government, and I cannot stress this enough, is that habeas, as Judge Hardiman has pointed out, is separate from what substantive rights, whether they be due process, the statute, or regulations there are to enforce. They're two separate rights, but are they really – I mean, they're two different rights, but are they really totally separated here? Because, you know, both are flexible, both are fact-driven. There seems to be some synergy between the two, and, frankly, for my purposes, speaking only for myself, I'm finding it very difficult to appreciate precisely what those synergies are. So my question is, do you agree that there's some sort of symbiotic relationship between the two clauses in this case, and if so, what's your understanding? Respectfully, Your Honor, I do not believe there is that synergy. And let me be clear about this. I think the Boumediene decision answers these questions. Boumediene involved enemy combatants at Guantanamo. The Supreme Court could not have been clearer over the government's objection, struck down the statute and said these detainees at Guantanamo have no ties to the United States, never stepped foot in the United States, have suspension clause rights. What the Supreme Court then said, making it clear these are distinct, we don't know whether they have due process rights, we're not going to decide it, that's on remand for the district court to decide, or maybe they have statutory rights to enforce, maybe they have regulatory rights. I think that's why there's not synergy. And you also go back to the arriving alien cases. Back then, arriving aliens had no due process rights, yet the Supreme Court repeatedly in cases like Gigio said, well, they at least get to say they didn't fall within the substantive statute or the regulations or there was some procedural error. So that's why they're distinct. The other point I want to make. So you say then follow Boumediene. It answers this case.  Well, we think Boumediene and other cases absolutely. And, Your Honor, I want to point out something else about Boumediene. In Section 5A of the opinion, page 779, I think this is critical because the government is suggesting, well, the scope of habeas review can pretty much be whatever Congress wants. Boumediene could not have been clear on that point. Boumediene starts by saying the scope of habeas is tricky, but there are two things we know that are uncontroversial that come from history. The first is questions of law and mixed questions have to be reviewable. And it also says if someone needs to be released, then the habeas court has to have that power to release. It then goes on to say it may be a factual, fact-specific, circumstance-specific question about whether they get review of facts, whether there are other things they get reviewable. But don't we have to take cognizance of the fact that that's a detention case, and the Supreme Court emphasized that these folks were facing, I think the word was generations of detention, right? And I assume that if the government here were to release your clients and to put them on a bus from Pennsylvania and deposit them in Mexico, that's not the relief you're seeking. That's not the relief, Your Honor. So why is this case not so factually different from Boumediene that Boumediene does not compare? I don't think the Supreme Court has ever drawn a distinction between release and challenging a removal order. And I think a few things on that. When the Supreme Court said in Boumediene at page 779, habeas has to be of review of questions of law, the only case it cited was St. Cyr, a challenge to removal order. It could have cited any case from any time in history. It chose to cite St. Cyr. The other thing is if challenge to removal order didn't fall within the core of the suspension clause, Sandoval would have made no sense. His court's decision went on and on about the suspension clause problems that would have arisen if there was no review of questions of law and mixed questions of law. The same is true in St. Cyr. There was no suggestion that removal order challenges and challenges to detention were different. The government's position is that you only have mistaken identity claims. That could not be more inconsistent with Boumediene, with St. Cyr, and I want to address the systemic point about going to E3. That's a red herring. The government knows full well the D.C. Circuit has said 60 days. The government has walked into the D.C. Circuit and invoked the 60 days. Moreover, that can only be 60 days from when there's a written policy. What happens in cases like ours where they're not raising a systemic challenge, they're simply trying to enforce the rights they have. Those are not systemic challenges. I promise you the government would say if we went to D.C., these claims cannot be reviewed. The other point is the government is saying we're only raising factual claims. That could not be more wrong. For example, the reforms, the regulations, the statutes say very clearly there has to be an explanation for why the claim was denied. The government says we're just raising factual claims. Well, how would the government know? They're just simply checking a box, no nexus. And as this court knows, asylum is not just purely factual. There are multiple legal questions in an asylum case. Did you have a particular social group? Were you protected on political opinion? Multiple, multiple legal questions. All those would be for the district court to figure out. At this point, as in Boumediene, the question is simply, do they have a right to raise legal questions and mixed questions? The substantive rights will be figured out by the district court. And again, I can't say this strongly enough, even if they don't have due process rights to enforce in the district court, they certainly have statutory rights and regulatory rights. The government would have to concede they have a right to a proper translator, to the asylum officer how to elicit all information, take into account country conditions. And is it your position that the only way they can get that is by way of a writ of habeas corpus and there's no other legal avenue that your clients could have adopted to make that? Absolutely, Your Honor. Only the writ. That's the only way they could get to federal court. There's no other cause of action that they could have brought. Absolutely, Your Honor. I think the government, I think we're probably in agreement on this, that no 1331 jurisdiction, APA jurisdiction, APA cause of action, any of those claims. The government is now coming up here and saying, oh, everything can be done in E3 in a systemic challenge. They know very well they would oppose these types of claims being brought in D.C. This is not what Congress intended to be brought in E3. And the government cannot say that the only review, that we are only raising factual claims and that's all habeas protects or habeas only protects due process rights and not statutory rights or regulatory rights. Over and over, the Supreme Court has said, statutory rights and regulatory rights can be enforced in habeas. That is in this Court's Sandoval decision. It is in our briefs. And it includes dozens and dozens of cases. I want to just close on the burden point because I think that's one of the elephants in the room, I think. We have filed 37 petitions. The government is talking about an enormous number of people. Thirty-seven petitions is all we've filed, and that's because there's a jurisdictional issue. We've filed maybe ten more around the country. People will not have counsel. We hope that after these are reviewed and some merits claims are rejected, some are not, that the asylum officers will then learn what the proper standards are. Maybe they're right in some cases. Maybe they're not. And I'll just close on this point. The Supreme Court has never let burden stop habeas corpus. The whole point of the suspension clause was because the framers understood it would be inevitable that the political branches would feel a pressing need to restrict Article III review. That was the whole purpose of the suspension clause. The arguments could not have been stronger in Boumediene saying, you cannot possibly give these enemy combatants habeas. That will screw up everything if you give them habeas. The Supreme Court rejected it. The government made these same arguments in Sandoval, the same arguments in Kwazam if you look at their briefs, the same arguments in St. Cyr. And as the amicus brief of habeas scholars points out, the ABA told the Supreme Court in St. Cyr, these exact same arguments were made in the early 1900s. There's too many immigrants coming. The habeas courts are too many. All right. I think we get that final point, Mr. Blair. Thank you, Your Honors. And we thank you very much. We thank both of counsel for a well-briefed case. They're very vigorous and insightful arguments. This is a tough case. The panel will take it under advisement, give it very careful attention. Thank you both very much.